EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEBRA KNIGHT, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:16-CV-322 PLC ) |
| NANCY A. BERRYHILL,[1] Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM AND ORDER

Plaintiff Debra Knight seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying her application for Disability Insurance Benefits under Title II of the Social Security Act.[2] Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

### *I.* *Background and Procedural History*

In October 2010, Plaintiff filed an application for Disability Insurance Benefits alleging she was disabled as of March 31, 2007, her alleged onset date of disability and her date last insured for purposes of Disability Insurance Benefits.[3] Plaintiff, born on January 3, 1956, claimed she was disabled as a result of: fibromyalgia; "severe widespread muscle pain, tenderness, & weakness"; chronic fatigue syndrome; depression, malaise, and anxiety; significant short-term memory loss; difficulty concentrating and focusing; osteoarthritis;

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 9).
[3] Plaintiff filed a previous application for Disability Insurance benefits, which the Commissioner denied in March 2009. (Tr. 192).

"residuals of past back injury"; neck pain and immobility; and sleep apnea. (Tr. 195). The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 29).

An ALJ conducted a hearing in February 2012 and, on May 25, 2012, the ALJ entered a decision denying Plaintiff's application for benefits.[4] (Tr. 10-25, 639-75). After the SSA Appeals Council denied Plaintiff's request for review, she appealed to the United States District Court. (Tr. 614-33). The court found that the ALJ erred in finding that Plaintiff retained the residual functional capacity ("RFC") to perform medium work because the ALJ: (1) improperly discounted the opinion of Plaintiff's treating physician; and (2) failed to support the RFC determination with citation to any medical evidence. Knight v. Colvin, Case No. 4:13-CV-1191 CEJ, 2014 WL 4352061, at *10 (E.D.Mo. Sept. 2, 2014). The district court reversed the Commissioner's denial of benefits and remanded for further proceedings with directions to "consider whether to obtain the opinion of a consultative examiner to determine whether plaintiff was able to maintain substantial gainful employment on March 31, 2007." Id.

Pursuant to the district court's remand order, the SSA Appeals Council vacated the Commissioner's final decision and remanded the case to the ALJ, who conducted a second hearing on January 29, 2015. (Tr. 537-84, 636). At the hearing, the ALJ heard the testimony of: medical expert, Dr. Anne Winkler, M.D., Ph.D., a specialist in internal medicine and rheumatology; Plaintiff; and a vocational expert. (Tr. 537-84). In a decision dated July 10, 2015, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920[5] and

---

[4] The ALJ found Plaintiff had the severe impairments of fibromyalgia and chronic fatigue syndrome and the residual functional capacity ("RFC") to "perform the full range of medium work as defined in 20 CR 404.1567(c)." (Tr. 10-25).
[5] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or

again determined that Plaintiff "was not under a disability within the meaning of the Social Security Act on March 31, 2007, the claimant's alleged onset date of disability and her date last insured[.]" (Tr. 462).

The ALJ found that, through the date last insured, Plaintiff had: the severe impairments of fibromyalgia, sleep apnea, and mild osteoarthritis of the right knee; and the non-severe impairments of mild mitral insufficiency and irritable bowel syndrome. (Tr. 464). After reviewing the medical opinion evidence, medical records, and testimony and finding that Plaintiff was "not entirely credible," the ALJ determined that, through March 31, 2007, Plaintiff had the RFC to perform light work:

> except the claimant should never climb ropes, ladders, or scaffolds but was able to occasionally climb ramps and stairs. She was able to frequently balance, stoop, kneel, crouch and crawl. The claimant should have avoided concentrated exposure to cold, wetness and humidity, and all exposure to unprotected heights.

(Tr. 465). The ALJ further determined that, through March 31, 2007, Plaintiff was unable to perform past relevant work but there existed a significant number of jobs in the national economy that Plaintiff could perform. (Tr. 470).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on January 15, 2016. (Tr. 454-57). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. *Standard of Review*

---

combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

A court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. Discussion

Plaintiff claims that substantial evidence does not support the ALJ's determination that she was not disabled on March 31, 2007, Plaintiff's alleged onset date of disability and date last insured.[6] More specifically, Plaintiff contends the ALJ erred in discrediting the opinion of her

---

[6] "If an applicant for disability benefits is not insured for Title II purposes, then we consider the applicant's medical condition as of his or her date last insured." Turpin v. Colvin, 750 F.3d 989,

4

treating physician and assigning great weight to that of a consulting physician. (ECF No. 9). Additionally, Plaintiff argues that the vocational expert's testimony at step five of the sequential evaluation process did not constitute substantial evidence because it was based upon an incorrect RFC. (Id.). Defendant counters that substantial evidence supports the ALJ's RFC assessment because: (1) the ALJ properly evaluated the medical opinion evidence; (2) the ALJ's hypothetical question accurately reflected Plaintiff's limitations; and (3) the ALJ properly evaluated Plaintiff's credibility. (ECF No. 17).

  *A. Medical opinion evidence*

    1. Treating physician

Plaintiff argues that the ALJ erred in discrediting the medical opinion of her treating physician, Dr. Rosemary Cannistraro, M.D. (ECF No. 9). In particular, Plaintiff maintains that the ALJ failed to provide "legally sufficient rationale" for discrediting Dr. Cannistraro who opined in a fibromyalgia RFC questionnaire of January 2012 that Plaintiff had severe functional limitations. (Id. at 15). In response, Defendant maintains that the ALJ properly discredited the extreme limitations contained in Dr. Cannistraro's opinion because they were inconsistent with the evidence as a whole. (ECF No. 17 at 8-9).

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has

---

993 (8th Cir. 2014) (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)). The ALJ found, and Plaintiff does not dispute, that her date last insured was March 31, 2007.

5

offered inconsistent opinions." Id. (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). See also Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Plaintiff's earliest record of treatment by Dr. Cannistraro is from a follow-up appointment in April 2003. (Tr. 57). At that appointment, Plaintiff reported light-headedness, neck discomfort, fatigue, abdominal pain and constipation, and joint swelling and tenderness. (Id.). Plaintiff again complained of fatigue, shortness of breath, and joint tenderness at an appointment in September 2003. (Tr. 56). In January 2004, Plaintiff complained of "neck arthritis," swollen ankles, abdominal pain, and shortness of breath. (Tr. 55). Plaintiff was taking Effexor and minocycline. (Id.).

Plaintiff returned to Dr. Cannistraro's office on August 3, 2004 with chest and shoulder pain, and she followed-up with Dr. Cannistraro on August 23, 2004. (Tr. 53-54). At that time, Plaintiff's chief complaint was "GERD," and she reported continued fatigue and joint pain "in feet mainly at night." (Tr. 53). Plaintiff's medications included Ranitidine, Effexor, minocycline, Prevacid, and pronanolol. (Id.). Plaintiff followed up with Dr. Cannistraro after a sleep study in October 2004, and reported that she was "still tired" and "somewhat" depressed. (Tr. 52). At an appointment in February 2005, Plaintiff complained of fatigue, shortness of breath, abdomimal pain, nausea, and joint swelling and tenderness, and Dr. Cannistraro refilled Plaintiff's prescriptions for Effexor, proponolol, and minocycline. (Tr. 51).

In January 2006, Dr. Cannistraro diagnosed Plaintiff with GERD, sleep disorder, and anxiety, and she prescribed Cymbalta. (Tr. 50). When Plaintiff returned to Dr. Cannistraro's

office the following month, Plaintiff reported continued fatigue but stated that the Cymbalta "works well" and she "seems to be less tired." (Tr. 59). Dr. Cannistraro increased Plaintiff's dosage of Cymbalta. (Id.).

In March 2006, Dr. Cannistraro noted that Plaintiff was "mentally much better" but her "pain [was] bad recently, can't even babysit, tried to work at Walmart" but could not sit or stand "all day." (Tr. 48). Dr. Cannistraro diagnosed Plaintiff with GERD and fibromyalgia. (Id.). The following month, Plaintiff was "terrible," depressed, more fatigued, and "not sleeping at all," and Dr. Cannistraro prescribed Adderall. (Tr. 47). At her next appointment in May 2006, Plaintiff reported that the Adderall helped her energy and pain. (Tr. 46). Plaintiff's fatigue continued to improve and, in August 2006, Dr. Cannistraro noted that the Adderall "has really helped fatigue + gives some quality of life." (Tr. 45).

Plaintiff returned to Dr. Cannistraro's office in January 2007 and reported that her fatigue was "much better." (Tr. 44). Dr. Cannistraro noted that Plaintiff had fibromyalgia and chronic fatigue syndrome, which "significantly improved with addition of Adderall and Cymbalta. This is [the] best patient has felt in years." (Id.). At a follow-up appointment on March 21, 2007, Dr. Cannistraro noted that Plaintiff's fatigue was "better" but she continued to experience shortness of breath. (Tr. 43). Plaintiff informed Dr. Cannistraro that she and her husband had driven to Mission, Texas and "'walked over bridge' Rio Grande." (Id.). Plaintiff also stated that the Adderall and Cymbalta helped but Cymbalta was too expensive. (Id.).

When Plaintiff returned to Dr. Cannistraro's office in June 2007, she complained of "pain issues," fatigue, abdominal pain, and joint tenderness. (Tr. 42). In August 2007, Dr. Cannistraro noted Plaintiff's joint pain, chronic fatigue, joint swelling in hands, joint tenderness "all over," fibromyalgia/chronic fatigue syndrome, and difficulties with "fibro fog + focus." (Tr. 41). In

7

October 2007, Dr. Cannistraro noted that Plaintiff's "sleep issues [were] worse off Cymbalta – couldn't afford it." (Tr. 40). Dr. Cannistraro prescribed Depakote, Adderall, fluoxetine, and hysocamine, and she recommended Plaintiff "try to exercise." (Id.). In November 2007, Plaintiff informed Dr. Cannistraro that she "wants off" Prozac, "didn't use Depakote due to fear of another pill" and she continued to suffer fatigue and difficulty sleeping. (Tr. 39).

Dr. Cannistraro continued treating Plaintiff from 2008 through 2011.[7] In September 2010, Dr. Cannistraro completed a physical RFC questionnaire for Plaintiff. (Tr. 274-78). In the questionnaire, Dr. Cannistraro diagnosed Plaintiff with fibromyalgia and chronic fatigue syndrome and noted that her symptoms included: "muscular weakness and tenderness in legs, arms, hands. Pt flinches with pain at slight touch in these areas." (Tr. 274). Where the questionnaire asked her to identify "clinical findings and objective signs," Dr. Cannistraro noted: "Fibromyalgia; osteoarthritis; malaise and fatigue; chronic fatigue syndrome; sleep apnea." (Id.).

In the 2010 RFC questionnaire, Dr. Cannistraro did not answer whether Plaintiff was a "malingerer," but opined that Plaintiff's "emotional factors contribute to the severity of [her] symptoms and functional limitations." (Id.). Specifially, Dr. Cannistraro noted that Plaintiff suffered depression and anxiety. (Id.). Dr. Cannistraro also stated that Plaintiff's impairments would "frequently" interfere with her attention and concentration and she was "incapable of even 'low stress' jobs." (Tr. 275). Dr. Cannistraro did not complete the questions about specific functional limitations, stating: "unable to evaluate." (Tr. 275-78).

In January 2012, Dr. Cannistraro completed an RFC questionnaire specific to patients with fibromyalgia. (Tr. 310-14). Dr. Cannistraro stated that Plaintiff had the following

---

[7] Dr. Cannistraro's treatment notes from the time period following Plaintiff's March 31, 2007 onset date of disability reflect that Plaintiff's continue to suffer irritable bowel syndrome, chronic pain, fatigue, sleep disturbance, chest pain, shortness of breath, depression, joint swelling of the hands, and headaches. (Tr. 34-39, 291-302, 305-06).

8

diagnosed impairments: fibromyalgia, irritable bowel syndrome, osteoarthritis, hypertension, esophageal reflux, and chronic pain syndrome. (Tr. 310). Dr. Cannistraro stated that Plaintiff was not a malingerer and suffered pain "all of the time, worse at other times, 2 days a month can be 'ok.'" (Tr. 311). Dr. Cannistraro opined that Plaintiff's pain would "constantly" interfere with her attention and concentration, she was incapable of even "low stress" jobs, and she would be absent from work more than four days per month. (Tr. 311, 313). In regard to functional limitations, Dr. Cannistraro stated that Plaintiff could: rarely lift/carry less than ten pounds; never lift/carry more than ten pounds; never twist, crouch, climb ladders, or look up; rarely stoop/bend, or turn head; and occasionally climb stairs, look down, or hold head in static position. (Tr. 313). According to Dr. Cannistraro, these symptoms and limitations applied since June 2005. (Tr. 314).

In her decision, the ALJ did not specify the amount of weight afforded Dr. Cannistraro's medical opinion, but she generally discredited it and adopted instead the opinion of the testifying medical expert, Dr. Winkler. The ALJ observed that Dr. Cannistraro was not certified in rheumatology and her "statements regarding alleged trigger point findings [in the 2012 RFC questionnaire] were not specifically documented during her physical examinations of the claimant." (Tr. 468). The ALJ also questioned Dr. Cannistraro's diagnosis of chronic fatigue syndrome because "it does not remotely comport with the agency's requirements for such diagnosis (SSR 14-1p)." (Tr. 469). Citing Dr. Winkler's testimony, the ALJ explained that the functional limitations identified by Dr. Cannistraro were also "very contrary" to the results of a stress test Plaintiff underwent in March 2008. (Tr. 468).

"A treating physician's opinion is not automatically controlling and may be discredited when other medical opinions are supported by better medical evidence or when the physician

9

gives inconsistent opinions." Turpin v. Colvin, 750 F.3d 989, 994 (8th Cir. 2014) (internal citations omitted). In this case, the ALJ found that Dr. Cannistraro's treatment notes did not support the extreme functional limitations identified in her 2012 RFC questionnaire. Despite stating in the questionnaire that that those limitations dated back to June 2005, Dr. Cannistraro's treatment notes reflect that in May 2006, August 2006, and January 2007, Plaintiff reported significant improvement with Cymbalta and Adderall. On March 21, 2007, ten days before the date last insured, Dr. Cannistraro noted that Plaintiff had traveled by car to Texas and walked across the Rio Grande.

Plaintiff cites Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001) and Singh v. Apfel, 222 F.3d 448 (2000) for the proposition that an RFC finding is a medical determination, and that the RFC must be based on at least some medical evidence.[8] See Lauer, 245 F.3d at 704; Singh, 222 F.3d at 452. Here, Dr. Winkler's medical opinion and the results of Plaintiff's stress tests support the ALJ's RFC determination. Upon review of the record, the Court finds that the ALJ properly evaluated Dr. Cannistraro's medical opinion, listing "good reasons" for discrediting it.

    2. Consulting physician

Plaintiff claims the ALJ erred in assigning great weight to Dr. Winkler's opinion. More specifically, Plaintiff argues that the ALJ "failed to properly consider all the testimony from Dr. Winkler relative to its consistency with plaintiff's testimony[.]" (ECF No. 9 at 15). In response,

---

[8] Plaintiff also appears to argue that the ALJ improperly evaluated her credibility. (ECF No. 9). However, the ALJ employed the proper analysis in discrediting Plaintiff's subjective complaints. The ALJ noted that, in January 2007 and March 2007, Plaintiff reported that her symptoms had improved with Adderall and Cymbalta. (Tr. 466). The ALJ also observed that, when Plaintiff visited Dr. Cannistraro "just over one week before the claimant alleges she became disabled," her chief complaint was "pap smear" and she reported driving to Texas and walking across a bridge over the Rio Grande. (Id.).

Defendant contends that the ALJ properly evaluated Dr. Winkler's testimony, which supported the ALJ's determination that Plaintiff had the RFC to perform light work with limitations.

At the hearing, Dr. Winkler testified that she was "board certified in internal medicine and rheumatology" and had reviewed Plaintiff's medical records. (Tr. 542). Dr. Winkler concluded that Plaintiff had the following impairments: fibromyalgia, sleep apnea, mild osteoarthritis of the right knee, "mild mitral insufficiency," and "probably irritable bowel syndrome." (Tr. 542-43). Dr. Winkler noted that Plaintiff underwent stress tests in 2002 and 2008 "and she actually had excellent tolerance with" a METs level of 12 in 2002 and 12.08 in 2008. (Tr. 545).

In regard to Plaintiff's RFC, Dr. Winkler explained that, based on Plaintiff's 2008 stress test, Dr. Winkler would place her at a "medium" work level. However, due to osteoarthritis in Plaintiff's knee, Dr. Winkler limited Plaintiff's RFC to light work. (Tr. 545-46). Dr. Winkler included the following functional limitations: "lift/carry 20 pounds occasionally and 10 pounds frequently"; "stand/walk six hours a day; "[n]o limits in terms of sitting"; never climb ladders, ropes, or scaffolds; occasionally climb stairs; and avoid concentrated exposure to cold, wetness, humidity, and unprotected heights. (Id.).

In response to questions by Plaintiff's attorney, Dr. Winkler affirmed that fibromyalgia symptoms "can wax and wane," but rejected the proposition that Plaintiff's excellent stress test score was attributable to a "good" day. (Tr. 547). Dr. Winkler explained: "What I can say is that she has excellent exercise capacity, and normally if somebody were like lying around a lot, they would not have that. They would be de-conditioned. . . . [S]omebody who can do 12.8 [METs] on a stress test for 10 minutes usually is fairly fit."[9] (Tr. 548). She further noted that

---

[9] In response to further questioning about the waxing and waning of symptoms, Dr. Winkler explained:

Plaintiff's stress test results "strongly support someone being able to do work activities[.]" (Tr 549).

Dr. Winkler acknowledged "complaints of fatigue throughout the record" but did not "see anything objective in the record that would indicate fatigue would be at a level not to be able to do work activity." (Tr. 549). In regard to nonexertional, or mental, limitations, Dr. Winkler testified that she did not consider mental health issues but noted "I didn't see a lot of treatment related to mental health issues, but I otherwise would defer to that." (Tr. 552). Dr. Winkler stated that, while fibromyalgia does not cause mental limitations, "like many chronic illnesses, there is a certain percentage of people who will have mental health issues like depression, anxiety. In most clinic trials where that has been looked at, it's about 30 percent." (Tr. 554-55). Dr. Winkler affirmed that "fibro fog, concentration issues . . . have for a long time been felt to be associated with fibromyalgia[.]" (Tr. 556). In her experience, "if there seems to be a significant fibro-[fog] or confusion, those kinds of things, what many of us will do is refer to a neuro psychologist to have in-depth testing to help sort through what may be causing that." (Tr. 557). Dr. Winkler did not find any record of such testing in this case. (Id.).

In her decision, the ALJ discussed Dr. Winkler's assessment of Plaintiff's 2008 stress test results and provided a detailed discussion explaining how the medical facts and non-medical evidence supported Dr. Winkler's conclusion that Plaintiff was capable of performing light work.

---

> What you do on a stress test is, it has to do with the oxygen utilization as well which has to do with fitness. So if somebody, as I tried to say earlier, somebody was down three days out of seven on a regular basis, that is not doing anything three days out of seven for months at a time, you would not get a [METs] of 12.8. You might get a [METs] of 3 or 4. So this suggests . . . in somewhat objective way that she's able to function really quite well generally on a regular basis because you have to be pretty fit to get a 12.8. I mean I power walk every morning. I'm not sure I could get 12.8. I haven't checked, but I do wonder.

(Tr. 550-51).

(Tr. 468). The ALJ afforded Dr. Winkler's opinions "great weight given her outstanding credentials and thorough review of the medical evidence before offering her analysis." (Id.).

To the extent Plaintiff argues that the ALJ overlooked consistencies between Dr. Winkler's and Plaintiff's testimony that support a finding of disability, Plaintiff mischaracterizes Dr. Winkler's testimony. While Dr. Winkler confirmed that fibromyalgia symptoms "can wax and wane," she did not, contrary to Plaintiff's assertion, suggest that Plaintiff's symptoms did so. Nor did Dr. Winkler accept Plaintiff's theory that Plaintiff performed well on the 2008 stress test because it was administered on a "good day." Furthermore, Dr. Winkler's testimony that approximately 30 percent of fibromyalgia patients suffered mental limitations – such as depression, anxiety, and difficulty concentrating – did not constitute evidence that Plaintiff had mental impairments requiring nonexertional limitations. In fact, Dr. Winkler expressly declined to testify to Plaintiff's nonexertional limitations. Finally, Dr. Winkler's general acknowledgement that "fibro-fog" and difficulty concentrating are often associated with fibromyalgia did not demonstrate that Plaintiff suffered such symptoms.

Upon review of the record and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided "good reasons" for the weight he accorded Dr. Cannistraro's and Dr. Winkler's opinions. Because substantial evidence on the record as a whole supports the ALJ's determination to discredit Dr. Cannistraro's opinion and assign great weight to Dr. Winkler's opinion, the Court will not disturb that determination.

*B. Vocational Expert Testimony*

Plaintiff claims that the vocational expert's answer to the hypothetical question did not constitute substantial evidence at step five of the sequential evaluation process because the question did not include nonexertional limitations. (ECF No. 9 at 20-21). Defendant counters

that substantial evidence supports the ALJ's step-five finding because "evidence of record did not support any additional limitations." (ECF No. 17 at 16).

If the ALJ finds at step four of the sequential evaluation process that a claimant cannot perform his past relevant work, the ALJ proceeds to step five, where the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c). See also Singh, 222 F.3d at 451. Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence to support the ALJ's decision. Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." Perkins v. Astrue, 648 F.3d 892, 901-02 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005)).

"The hypothetical question need only include those impairments and limitations found credible by the ALJ." Gragg v. Astrue, 615 F.3d 932, 940 (8th Cir. 2010) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005)). Here, the ALJ noted that Plaintiff was never "treated or evaluated for underlying mental health issues and the cognitive limitations associated with fibromyalgia." (Tr. 469). Indeed, the only evaluation relating to Plaintiff's mental health, a psychiatric review technique completed by non-examining psychiatrist Dr. Ricardo Moreno in November 2010, diagnosed Plaintiff with depression but found insufficient evidence to determine the extent of any limitations. (Tr. 279-89). In addition, Dr. Winkler testified that, based on the treatment records, Plaintiff's fatigue would not preclude her from performing all work activity. (Tr. 469).

Here, the absence of medical evidence documenting mental health impairments and Dr. Winkler's testimony supported the ALJ's decision not to include non-extertional limitations in Plaintiff's RFC. Because the hypothetical question included all of Plaintiff's limitations found to exist by the ALJ and set forth in the ALJ's description of Plaintiff's RFC, the hypothetical question was proper and the vocational expert's testimony constituted substantial evidence supporting the Commissioner's denial of benefits.

## IV. Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of January, 2018